Manchester District Court
No. 2008-706

SOUTH WILLOW PROPERTIES, LLC

v.

BURLINGTON COAT FACTORY OF NEW HAMPSHIRE, LLC

Argued: September 10, 2009
Opinion Issued: December 16, 2009

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*James F. Ogorchock* and *John Mark Turner* on the brief, and *Mr. Ogorchock* orally), for the plaintiff.

*Cleveland, Waters and Bass, P.A.*, of Concord (*William B. Pribis* on the brief and orally), for the defendant.

BRODERICK, C.J. This is a commercial landlord/tenant dispute between the landlord, plaintiff South Willow Properties, LLC (South Willow), and the tenant, defendant Burlington Coat Factory of New Hampshire, LLC (BCF). BCF appeals an order of the Manchester District Court (*Emery*, J.) finding that it failed to obtain South Willow's permission before replacing the roof at its retail store, and that such failure constitutes a breach of the lease and grounds for eviction. We affirm.

The record contains the following facts. BCF, a retail clothing merchant, is a tenant in a shopping plaza in Manchester owned by South Willow. In late 2002, BCF assumed the obligations under a 1974 lease between the parties' predecessors-in-interest and took occupancy of the space at issue.

When BCF moved into the premises, there were occasional leaks in the roof that were satisfactorily repaired by South Willow. In 2003, BCF undertook renovations to the property that included removing an interior concrete load-bearing wall, which caused serious structural problems; removing seven HVAC units and installing sixteen new units, which resulted in several large holes in the roof; and changing the facade of the building, which required four large holes in the roof to attach the support beams. As a result of these renovations, the roof developed numerous, severe leaks. The deflection in the roof caused by removal of the load-bearing wall and the negligent installation of the structural steel installed to support the remaining wall resulted in a "waterfall" coming through the roof. In 2004, BCF acknowledged responsibility for the structural problems, including the leaks, and agreed to pay for the engineering services and construction costs required to remedy them.

In September 2004, South Willow informed BCF that "none of the outstanding issues," including those concerning roof damage, had been resolved. The parties continued to disagree about the adequacy of BCF's repairs to the roof into 2005. In August 2005, BCF alleged that fixing the roof leaks was South Willow's responsibility and that it would replace the

roof if South Willow did not. South Willow responded by instructing BCF not to engage in any type of roof replacement without its written consent and notifying BCF that doing so would be "a default under the lease."

On September 8, 2005, BCF sent a letter to South Willow in which it stated, "[R]eplacement of the roof is Landlord's responsibility under Article 14 of the Lease. Further, under Article 28 of the Lease, in the event Landlord fails to perform any of its obligations under the Lease, and after seven (7) days notice, Tenant may cure such default on Landlord's behalf." By letter dated the following day, South Willow reiterated that BCF "does not have the Landlord's permission to perform any work on the roof" and doing so "without landlord's written consent would be a default under the lease." On October 13, 2005, BCF sent an email to South Willow attaching bids for a new roof and requesting a decision by October 19. On October 31, without notification to South Willow, BCF signed a contract for replacement of the roof.

On February 23, 2006, South Willow sent a letter to BCF stating that it was locating a contractor to install a new roof. On March 2, BCF faxed a letter to South Willow stating that it had "already contracted with a roofing contractor to replace the roof." Demolition of the roof commenced that same day. South Willow responded on March 2, instructing BCF to cease all roof work, but BCF proceeded to have its contractor replace the existing roof.

On October 17, 2006, South Willow served a notice to quit and in May 2007, filed its landlord-tenant writ. On October 31, 2007, the district court concluded that the notice to quit was not sufficiently specific and dismissed the case. Two days later, South Willow issued a new eviction notice and notice to quit. A new possessory action was filed and, following a bench trial, the court ordered the issuance of a writ of possession.

BCF appeals, arguing that the trial court erred: (1) in ruling that South Willow's second action was not barred by the doctrine of res judicata; (2) in ruling that South Willow's continued acceptance of rent did not constitute a waiver of South Willow's right to evict; (3) in its interpretation of the lease; (4) in excluding expert testimony; (5) in failing to find that BCF's replacement of the roof was a non-material breach of the parties' lease; and (6) in finding that there was insufficient evidence to prove the property was not safe or unsuitable for its intended use.

We first address BCF's argument that the trial court erred by not dismissing South Willow's second lawsuit under the doctrine of res judicata. BCF argues that the judgment in the first lawsuit was a "final judgment on the merits" in that South Willow failed to prove service of a proper eviction notice, which BCF contends was a "material element of its claim."

■ The applicability of res judicata is a question of law, which we review *de novo. Meier v. Town of Littleton*, 154 N.H. 340, 342 (2006). Res judicata precludes litigation in a later case of matters actually decided, and matters that could have been litigated, in an earlier action between the same parties for the same cause of action. *Id.* For the doctrine to apply, three elements must be met: (1) the parties must be the same or in privity with one another; (2) the same cause of action must be before the court in both instances; and (3) a final judgment on the merits must have been rendered in the first action. *Id.* The parties do not dispute that the first two elements are met. The issue before us, therefore, is whether a final judgment on the merits was rendered in the first action.

On October 17, 2006, South Willow served BCF with a thirty-day notice to quit. The notice stated: "You are hereby notified to quit and deliver possession of 1525 South Willow Street . . . no later than November 18, 2006 (30 days from the date of this Notice) for your failure to comply with Section 15 of the Lease requiring the tenant to provide plans and specifications and obtain the written consent of the Landlord prior to engaging in structural work on the demised Premises." BCF filed a special plea and brief statement of defenses arguing, in part, that the notice to quit was defective because it set forth two different notice periods, it failed to allege that BCF committed a material breach of the lease, it failed to state with sufficient specificity the reason(s) for the eviction, and its notice period was insufficient.

The court held a bench trial and at the close of evidence BCF argued that the notice to quit failed to comply with RSA 540:3 because the notice was not specific as to the tenant's alleged conduct and it did not give a sufficient notice period. The trial court agreed and granted BCF's motion to dismiss. In its order, the court stated: "Given this decision, the court did not address the other issues raised by the defendant nor did the court rule on the requests for findings." Two days later, South Willow served BCF with a second eviction notice and notice to quit.

■ RSA chapter 540 (2007 & Supp. 2008) authorizes summary posses-sory actions to simplify and facilitate the landlord's recovery of possession of the premises. *Lavoie v. Szumiez*, 115 N.H. 266, 267 (1975). The purpose of such actions "is to permit the landlord to recover possession on termination of a lease without suffering the delay, loss and expense to which he may be subjected under a common-law action." *Matte v. Shippee Auto*, 152 N.H. 216, 218 (2005) (quotation omitted). Because RSA chapter 540 "establish[es] rights and benefits which a landlord did not enjoy at common law, strict compliance with [its] terms is required." *Lavoie*, 115 N.H. at 267. Pursuant to RSA 540:2, I, "[t]he lessor or owner of nonrestricted property

may terminate any tenancy by giving to the tenant . . . a notice in writing to quit the premises in accordance with RSA 540:3." RSA 540:3 requires that an eviction notice "state with specificity the reason for the eviction."

A judgment based upon a "plaintiff's failure to satisfy a precondition to suit, does not bar another action by the plaintiff instituted after . . . the precondition has been satisfied." RESTATEMENT (SECOND) OF JUDGMENTS § 20(2) (1982). This rule applies whether the fact that a precondition has not been satisfied "appears on the face of the pleadings, as a result of pretrial discovery, or from the evidence at trial." *Id.* § 20 cmt. k. Here, the trial court determined that South Willow's first notice to quit did not "state with specificity the reason for the eviction" as required by RSA 540:3. "If the first suit was dismissed for defect of pleadings . . . or was disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to another suit." *Costello v. United States*, 365 U.S. 265, 286 (1961); *see Hamilton v. William Calomiris Inv. Corp.*, 461 A.2d 466 (D.C. 1983) (dismissal based upon landlord's failure to give a notice to quit did not preclude landlord from filing a new suit for possession). We hold that the trial court's dismissal, based upon a technical defect in the notice to quit, was not a decision on the merits and, accordingly, did not bar South Willow's second lawsuit.

The next issue is whether South Willow waived its right to proceed with the eviction by its continued acceptance of rent. BCF argues that based upon *Miller v. Slania Enters.*, 150 N.H. 655 (2004), and *Colonial Village v. Pelkey*, 157 N.H. 91 (2008), "the landlord must take some affirmative step to put the tenant on notice that the landlord's acceptance of future rent after claiming a breach and serving an eviction notice will not operate as a waiver of the landlord's right to proceed with an eviction."

"A finding of waiver must be based upon an intention expressed in explicit language to forego a right, or upon conduct under the circumstances justifying an inference of a relinquishment of it." *N. Country Envtl. Servs. v. Town of Bethlehem*, 146 N.H. 348, 354 (2001) (quotation omitted). Waiver is a question of fact and we will not overturn the trial judge's determination unless clearly erroneous. *Id.*

In *Miller*, the tenant, whose lease was due to expire at the end of May, did not pay rent for April and the landlord prevailed on its possessory action. *Miller*, 150 N.H. at 657. Thereafter, the landlord and tenant verbally agreed that if the tenant paid the April and May rent, the tenant could remain in the premises until the end of May. *Id.* After the tenant held a party that the landlord believed was a violation of the original lease and the subsequent verbal agreement, the landlord had the tenant removed with the previously issued writ of possession. *Id.* We concluded that eviction was

improper because the parties had expressly agreed to create a new tenancy that lasted until the end of May. *Id.* at 661. Accordingly, the landlord was obligated to start a new possessory action if it wanted to evict the tenant because of the party. *Id.*

In *Colonial Village*, after the landlord served a notice to quit, it accepted ongoing rent payments from its tenant. *Colonial Village*, 157 N.H. at 91. The trial court ruled that the landlord's acceptance of rent waived its right under the eviction notice. *Id.* at 92. The landlord thereafter served a new notice to quit, advising the tenant that its acceptance of rent "should not be construed as a waiver to issue a notice to quit." *Id.* The trial court issued a writ of possession, rejecting the tenant's argument that the acceptance of rent waived the landlord's right to evict. *Id.* We affirmed, holding that the acceptance of future rent does not create a new tenancy where there is evidence a landlord intended to continue with eviction proceedings despite the payment. *Id.* at 93.

Based upon these cases, BCF argues that South Willow's "unqualified acceptance of rent," following its claim of breach of the lease for BCF's unauthorized replacement of the roof, constituted a waiver. We do not agree that *Miller* and *Colonial Village* compel a finding that South Willow waived its right to bring an eviction proceeding. Throughout 2003, 2004, and into 2005, the parties engaged in numerous communications concerning BCF's negligent construction work, and South Willow repeatedly informed BCF that it was in default of the lease for conducting unauthorized work. On March 2, 2006, the date that BCF notified South Willow that it was proceeding with demolition and replacement of the roof, South Willow notified BCF in writing that it was reserving all of its rights to pursue whatever remedies were available to it. Similarly to *Colonial Village*, on November 2, 2007, South Willow served its second eviction notice and notice to quit, which stated that "[a]ll payments hereafter received from you for the use and occupancy of said Premises shall be accepted with the reservation of all rights under this Notice and any subsequent eviction proceedings."

Based upon the totality of the parties' conduct, we conclude that South Willow neither expressed in explicit language its intent to forego its right to pursue eviction nor conducted itself in such a way as to justify an inference that it relinquished such a right. *See N. Country Envtl. Servs.*, 146 N.H. at 354. We hold that the trial court did not err in finding that South Willow's "acceptance of rent, under the circumstances of this case, does not constitute waiver of the right to evict."

■ Next BCF argues that the trial court erred in interpreting paragraphs 14, 15 and 28 of the parties' lease. "The proper interpretation of a lease is ultimately a question of law for this court to determine. As with any contract, we interpret a lease by giving its terms their reasonable meaning." *Alexander v. Blackstone Realty Assocs.*, 141 N.H. 366, 368-69 (1996) (brackets, quotation and citation omitted). "It is this court's task to interpret the contract, using facts found by the trial court. In our search for the interpretation that will best reflect the parties' intention, the court considers the written agreement of these parties, all of its provisions, its subject matter, the situation of the parties at the time, and the object intended." *Thiem v. Thomas*, 119 N.H. 598, 602 (1979) (citation and quotation omitted).

On September 8, 2005, BCF notified South Willow that "replacement of the roof is Landlord's responsibility under Article 14 of the Lease. Further, under Article 28 of the Lease, in the event Landlord fails to perform any of its obligations under the Lease . . . Tenant may cure such default on Landlord's behalf and at Landlord's expense." South Willow responded by informing BCF that it "does not have the Landlord's permission to perform any work on the roof of the Premises. To do so without landlord's written consent would be a default under the lease."

Paragraph 14 of the lease provides:

> Tenant shall make and pay for all . . . nonstructural repairs and replacements to the interior of Tenant's buildings which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said buildings which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair.

Paragraph 15 of the lease provides:

> Tenant may, at its own expense, from time to time make such interior alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not with-

hold its consent thereto if the structural strength of the building will not be impaired by such work.

Paragraph 28 of the lease provides:

> In the event Landlord shall . . . fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant . . . cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith . . . .

Pursuant to paragraph 14 of the lease, repairs due to the tenant's negligence are the responsibility of the tenant. The trial court found that BCF engaged in negligent construction when it undertook renovations to the property. Because BCF caused the damage at issue to the building by its negligent construction, it was BCF's responsibility to fix the damage. However, as the trial court found, it is "undisputed that removal and replacement of the roof is a structural alteration, addition and change" to the structure as contemplated in paragraph 15 of the lease. Thus, before undertaking "alterations, additions or changes," BCF was required to submit plans and specifications for the proposed work to South Willow and receive its written approval. It is only after the landlord, despite receiving plans and specifications, refuses to authorize "alterations, additions or changes" that the tenant may exercise self-help under paragraph 28 of the lease.

BCF argues that the roofing bids it provided South Willow in October 2005 were detailed plans and specifications regarding the work to be performed, in satisfaction of paragraph 15 of the lease. BCF characterizes the bids as describing "the scope of work to be performed, the type of roof to be used, and generally [giving] 'a pretty detailed report of the work' to be performed in the roof replacement." Thus, BCF argues that it "made every effort to comply with the lease — providing South Willow with detailed plans and specifications regarding the work to be performed. Nonetheless, South Willow continued to withhold permission for BCF to do what was necessary to properly operate its business. Under the circumstances, BCF could hardly be faulted for doing what was indisputably necessary."

However, as the president of South Willow, Charles Kramer, testified at trial, the Academy Roofing quote, like the other bids received, only provided "a general description" of the work the roofer intended to perform. He testified that the quote lacked specificity because it did not discuss, for example, how the flashing would be installed, the details for preventing water leakage around each of the vents and pipes to be installed

with the HVAC units, how the 84,000 square feet of old roofing material would be disposed of, and whether the material contained asbestos and, if so, how it would be treated in compliance with New Hampshire environmental laws. Kramer also testified that in addition to a general quote, "plans and specifications" would include "detailed conversations with the roofer," "detailed drawings," "shop drawings to handle certain specific, unique situations," a "field walk-through," and an "inspection." Furthermore, BCF did not specify which of the several bids it was going to choose. Based upon the evidence at trial, we affirm the reasonableness of the trial court's finding that the bids forwarded to South Willow on October 13, 2005, "were not plans and specifications, as those terms are normally used, to satisfy the requirements of paragraph 15."

█ Next, BCF argues that the trial court erred in excluding expert testimony offered by its commercial roofer. New Hampshire Rule of Evidence 103(b)(2) requires a contemporaneous offer of proof in order to preserve for appeal an objection to a ruling excluding evidence. The record, however, does not indicate that BCF made an offer of proof at trial with respect to the evidence it now alleges was improperly excluded. We hold, therefore, that BCF is precluded from raising this issue on appeal. *See State v. Saulnier*, 132 N.H. 412, 413-14 (1989).

██ BCF argues next that the trial court erred in finding that a material breach of the lease occurred. "Whether conduct is a material breach is a question for the trier of fact to determine from the facts and circumstances of the case." *Barrows v. Boles*, 141 N.H. 382, 388 (1996) (quotation and brackets omitted). On appeal, we will not reverse the findings of the trial court unless they lack support in the record. *Id.* BCF does not argue that the trial court's findings lack support. Rather, it argues that because South Willow delayed before serving notice and commencing an eviction action and because it "received a . . . brand new roof with a fifteen year warranty," it was erroneous for the trial court to find a material breach of the lease. However, we conclude that the record supports the trial court's finding that BCF's unauthorized demolition and reconstruction of the roof, over South Willow's express written objection, justified eviction.

█ Finally, BCF argues that the trial court erred in finding the evidence insufficient to prove the property was not safe or unsuitable for its intended use. When BCF undertook renovations to the property in 2003 the work initially resulted in "severe and numerous leaks." However, as the trial court's order notes, "[o]ver the course of the next year various repairs were made . . . [which] lessened the number and severity of the leaks." There was testimony at trial that the leaks required employees to "move racks of

clothing," "[c]over them with plastic," "[b]ring out barrels to catch the drips," and "tape off some areas where customers couldn't get in there till we got it mopped and got it cleaned up." Based upon the record, we affirm the trial court's finding that "[a]lthough there was evidence the leaks were inconvenient, there was insufficient evidence to prove the property was not safe or unsuitable for its intended use."

*Affirmed.*

DALIANIS, DUGGAN, HICKS and CONBOY, JJ., concurred.